**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BERNARD MIMS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-7192 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

In 2000, Dwayne Baker was shot dead at an apartment building on Chicago's South Side. The Chicago Police Department believed that Baker was the victim of gang violence. The police suspected that members of the notorious Black Disciples gang had meant to kill Bolo Jones, a high-ranking member of the rival Gangster Disciples.

In 2004, after an investigation that lasted several years, Plaintiff Bernard Mims was charged with Baker's murder. At a bench trial in 2006, Mims was found guilty and sentenced to 95 years in prison.

In 2016 – after Mims had served over a decade in prison – Mims's conviction and sentence were vacated. He received a certificate of innocence from the state.

Mims turned around and sued the City of Chicago and the police officers involved in the Baker murder case. He brought a basket of constitutional claims, but a number of those claims have fallen by the wayside.

The remaining claims involve the alleged suppression and fabrication of evidence. Mims faults the police officers for suppressing recordings, even though the police gave the recordings to the prosecutors, and the prosecutors gave the recordings to the trial court during the bench

trial. He also faults the photo array as unduly suggestive. One of the arguments is that the lineup included too many photos.

After extensive discovery, Defendants moved for summary judgment. For the reasons explained below, Defendants' motion for summary judgment is granted.

## Background

### I.     The Baker Homicide

After midnight on October 12, 2000, a gold SUV pulled up to a gas station across the street from the front entrance of the Rosenwald, a housing project in Chicago's Bronzeville neighborhood. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 192). Two people exited the vehicle and began shooting an AK-47 rifle toward the building's entrance. *Id.*

Dwayne Baker – a security guard at the Rosenwald – was shot and killed. *Id.* at ¶¶ 5–6. Catrice Davis, a bystander, was shot in the leg. *Id.* at ¶ 5.

### II.    The Investigation

Chicago police officers – including Defendants – began investigating right away, and interviewed dozens of witnesses about the shooting. *Id.* at ¶ 8.

The witnesses gave the police varying descriptions of the shooter. *Id.* at ¶ 9. The witnesses described the shooter as a black male with a light or medium complexion. *Id.* The interviewees gave height estimates ranging from 5'7" to 6'1." *Id.* Witnesses estimated the shooter's age as somewhere between his late teens to his late twenties. *Id.*

The interviewees gave varying descriptions of the shooter's attire. At least one witness described the shooter as wearing dark pants and a jacket. *Id.* Another witness said that the shooter sported a blue denim suit. *Id.* Yet another witness claimed that the shooter wore a knee-length "Fog"-type jacket with a baseball cap. *Id.*

2

Witnesses also saw other people in the SUV, in addition to the shooter. *Id.* at ¶ 10. Witnesses reported a second man exiting the SUV, and one or two others inside the vehicle. *Id.* Witnesses also told the police that they saw the SUV speed off westbound on 47th Street after the shooting. *Id.*

Many witnesses believed that the shooting was gang-related. According to several witnesses (and even one FBI agent), the SUV occupants – including the shooter – were likely members of the Black Disciples gang. *Id.* at ¶ 12.

Those witnesses believed that the intended target was Kenneth "Bolo" Jones, a high-ranking member of the rival Gangster Disciples gang. He controlled the Gangster Disciples' drug sales around the Rosenwald building. *Id.* at ¶¶ 12–13.

Apparently, Jones (the intended victim) looked like Baker (the actual victim). *Id.* at ¶ 12. And Jones entered the Rosenwald Building shortly before the shooter killed Baker. *Id.* at ¶ 13.

Some of the interviews took place in the days after the shooting. And some of the interviews happened years later.

### A.    Interviews in the Days After the Shooting

One witness, Joseph Williams, was exiting the gas station across the street from the Rosenwald on the night of the homicide when the gold SUV pulled up. *Id.* at ¶ 11. The day after the shooting, Williams helped the police create a composite sketch of the shooter and the weapon. *Id.*

Williams described the shooter as a black male between the ages of 25–28, between 5'9" and 5'11", with a full beard and mustache, wearing a baseball cap. *Id.* Williams said the shooter exited the SUV through the rear passenger door, firing a military-type rifle at the Rosenwald. *Id.*

The police also interviewed Bolo Jones (again, the intended victim) the day after the shooting. Jones said that multiple people warned him, just before the shooting, that it was not safe for him to be at the Rosenwald that night. *Id.* at ¶ 14.

Jones also told the police that, in the summer of 2000, the Black Disciples had twice fired shots at him at the gas station across from the Rosenwald. *Id.* Jones even named one of the shooters: a Black Disciple member named Melvin Richardson (more on him a little later). *Id.*

A day after interviewing Jones, the police interviewed Lamont Kent, another witness. *Id.* at ¶ 16. Kent was inside the Rosenwald at the time of the shooting. *Id.* He said that he looked out a window and saw the shooter holding a long black and grey gun. *Id.*

Kent described the shooter as a man with small to medium build between 5'11" and 6'1" wearing tan pants, a black and orange shirt, and possibly braids. Kent also told the police that an individual known as "Wallace" was outside the building just after the shooting and that Wallace could identify the shooter. *Id.*

"Wallace" was Wallace Fields. The police – including Defendant Detective Daniel McNally – interviewed Fields about a week and a half after the shooting. *Id.* at ¶ 17. Fields told the police that he had witnessed the homicide, and he described what happened. *Id.* He told the police that he saw two black males exit the gold SUV with guns, and that one gun was an AK-47. *Id.*

Fields described the shooter as a slim-built, 5'10" to 5'11", 170-pound male in his mid-twenties with a dark complexion, wearing all black and holding the AK-47. *Id.* According to a police report about the interview, Fields reported the shooter as someone he had seen before, but didn't know by name. *Id.*

4

### B.     Interviews in the Months After the Shooting

Months later, on February 19, 2001, Melvin Richardson was arrested for possession of cocaine.  *Id.* at ¶ 20.  Again, Richardson was a Black Disciple.  Recall that Bolo Jones (likely the intended victim) claimed that Richardson had shot at him at the gas station across from the Rosenwald before the Baker homicide.

The arrest of Richardson triggered an investigative alert / stop order relating to the Baker shooting.  *Id.*  A day later, Detective McNally interviewed Richardson about the Baker homicide.  *Id.*

Richardson denied any involvement in the incident.  A polygraph that same day was consistent with his denial.  *Id.* at ¶¶ 20–21.

But Richardson told Detective McNally something else, too.  Richardson said that another Black Disciple, Mike Sardin, admitted to Richardson that he and two other Black Disciples (Taboo McNeal and Dwayne Chester) went to the Rosenwald to shoot rival Gangster Disciples on the night of Baker homicide.  *Id.* at ¶ 20.  According to Richardson, Sardin also told him that Chester had shot at the Rosenwald.  *Id.*

Richardson then agreed to wear a wire and record a conversation with Sardin about the Baker homicide.  *Id.* at ¶ 22.  Cook County Circuit Court Judge Michael P. Toomin granted an order allowing the recording to be made.[1]  *Id.*

---

[1]  Unfortunately, Judge Toomin passed away in 2023 after a prominent career on the bench spanning more than four decades.  *See Hon. Michael P. Toomin 1938-2023*, Illinois State Bar Ass'n (Aug. 7, 2023), https://www.isba.org/barnews/2023/08/honmichaelptoomin19382023 ("Judge Toomin will be remembered as 'judge's judge'; as a jurist whose knowledge of the law was encyclopedic; as a man of integrity and compassion; and as a friend who regaled his 'pals' with stories of his escapades during high school and his work on the bench."); Violet Miller, *Michael Toomin, Retired Cook County Judge Known for High-Profile Cases, Fight with Democratic Party, Dead at 85*, Chi. Sun-Times (July 22, 2023), https://chicago.suntimes.com/obituaries/2023/7/21/23803754/michael-toomin-obituary-retired-cook-county-judge-slating-fight-2020-vanecko-smollett-dies-at-85 ("His life was the law. . . . If there was a judge's hall of fame, he would be one of the first people admitted to it.") (quoting Assistant Cook County

During the recorded conversation, Sardin repeatedly denied that he or any other Black Disciple was involved in Baker's death. *Id.* at ¶ 24. But after listening to the recording, Detective McNally concluded that something was off about how Richardson structured his questions. *Id.* at ¶ 25. Detective McNally believed that Richardson somehow revealed the recording device to Sardin during the conversation, and felt deceived by Richardson. *Id.*

In March 2001, Judge Toomin entered a retention and review order stating that he had listened to the tapes made under his order. *Id.* at ¶ 25. Judge Toomin ordered the original tapes to be impounded with the Clerk of Court. *Id.*

### C.    Interviews in the Years After the Shooting

By the next year, the Baker homicide was classified as a "cold case." A new investigative team – the Chicago Police Department Cold Case Squad – took over. *Id.* at ¶ 26.

While investigating the Baker case, the Cold Case Squad collaborated with a task force on an operation called "Operation Pickup." *Id.* at ¶ 27. The goal of Operation Pickup was to investigate and build federal RICO cases against Black Disciples gang members. *Id.*

In early 2001, a Black Disciple named Dan Thomas spoke to two of the new investigating officers – Defendants (and former Gang Crimes Specialists) Richard Peck and Robert Montgomery. *Id.* at ¶ 30. According to Thomas, another gang member told him that Taboo McNeal, a target of Operation Pickup, shot an officer at the Rosenwald on orders from a Black Disciples leader. *Id.*

---

Public Defender Bill Murray); Madeline Buckley & Shanzeh Ahmad, *'A Judge's Judge': Michael Toomin, Who Presided Over Major Trials and Juvenile Court, Dies After Retiring from Cook County Bench* (July 24, 2023, 10:21 PM), https://www.chicagotribune.com/2023/07/24/a-judges-judge-michael-toomin-who-presided-over-major-trials-and-juvenile-court-dies-after-retiring-from-cook-county-bench/ ("As a judge, he cultivated a reputation as a conscientious decision-maker and earned the affectionate nickname of the 'Toominator.'").

6

After that, another Defendant – Detective Kenneth Boudreau – spoke to Thomas. *Id.* at ¶ 31. Detective Boudreau then obtained an order (from Judge Toomin) to record a conversation between Thomas and other Black Disciples, including McNeal. *Id.*

But according to the Defendant officers, no officer ever acted on that judicial order. *Id.* at ¶ 32. No recording was seemingly ever made – at least, none was ever located. *Id.*

Around the same time, another witness, William Ransom, told Defendant Detective Michael McDermott that he knew a Black Disciples leader ordered four gang members – including Plaintiff Mims – to shoot any Gangster Disciples they encountered. *Id.* at ¶ 33.

Ransom also told McDermott about a separate shooting of a Gangster Disciple, who was killed with an AK-47 – the same type of weapon used in the Baker shooting. *Id.* And Ransom said that some Black Disciples had told him that their gang's leadership sent some members to the Rosenwald to kill a Gangster Disciple on October 12, 2000 – but that Baker was mistakenly killed instead. *Id.*

Based on this information, the police obtained judicial approval to record a conversation between Ransom and potential suspects. *Id.* at ¶ 34. But once again, no recording was ever made, or at least found. *Id.* at ¶ 35.

Fast forward a few months, to May 2001. Another officer on the new team, Defendant Detective Przepiora, learned about Thomasina McKee. McKee was a new, important lead. She was a purported witness to the Baker shooting who the police had not yet interviewed. *Id.* at ¶ 37.

Przepiora and McDermott interviewed McKee in June 2001. *Id.* at ¶ 38. McKee told the officers that she had witnessed the shooting with two other women.[2] *Id.* She said that she saw

---

[2] The police interviewed both women in 2004, more than three and a half years after the homicide. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 45 (Dckt. No. 192). Both women – Erma Jones and Danielle

who shot Baker. *Id.* McKee said that on the night of the shooting, she saw a black male emerge from the rear passenger side of a gold SUV, holding an AK-47-type rifle. *Id.*

McKee described the shooter as 20–25 years old, 6'0" tall, and wearing a black hat, black pants, and black jacket. *Id.* at ¶ 40. She identified the shooter as someone she knew as "Bern." *Id.* at ¶ 38.

McKee said that she saw another individual exit the SUV's rear driver's side with a chrome handgun. *Id.* McKee described the second person as a black male in dark clothing, between 5'5" and 5'6" tall. *Id.* at ¶ 40.

After McKee's interview, she identified a photo of Mims as "Bern," and signed the back of the photo.[3] *Id.* at ¶ 41. That photo of Mims was from a February 2000 arrest for criminal trespass. The arrest report from that arrest described Mims as 6'2", 170 pounds, and 19 years old, with braided hair, medium complexion, and the nickname "Berny." *Id.* at ¶ 42.

Other arrest reports (from June 4, 1999 and February 9, 2000) identify a tattoo reading "Burn" on Mims's lower right arm. *Id.* Mims was arrested eight times in 2000, and most mugshots depicted him with light facial hair. *Id.* at ¶ 43. Each fact was consistent with at least some of the witnesses' accounts.

A few months after interviewing McKee, the police spoke to another witness, Tashunda Crafton. *Id.* at ¶ 50. Crafton said she had been in a relationship with Baker (the victim) at the

---

Gaines – confirmed they were with McKee when Baker was shot. *Id.* But Jones and Gaines could not, or would not, identify the shooter from a photo array. *Id.*

[3] Defendants offer evidence that Przepiora prepared a photo array of potential suspects for McKee, including Mims, McNeal, and Sardin. *See* Przepiora Dep., at 105:7-13 (Dckt. No. 180-1, at page 227 of 426). Mims disputes Przepiora's deposition testimony that McKee was shown an array of suspects. He claims, instead, that officers showed McKee only the photo of Mims, and no other photos of potential suspects. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 192). In any event, McKee was re-interviewed in November 2003, and again identified the photo of Mims as the shooter and said she remembered signing the photo. *Id.* at ¶ 47.

time of the shooting.  *Id.*  She told Detective Przepiora that on the night of the shooting, she saw "Bern" in the middle of the street near the Rosenwald, pointing a "chopper" (a term for an AK-47-type rifle) at the building.  *Id.*

Crafton also said that she had sold drugs for "Bern."  *Id.* at ¶ 51.  According to Crafton, sometime after the shooting, "Bern" threatened to beat her if she did not give him money or return drugs that he had fronted her, and he yelled, "That's why I shot your man!"  *Id.*  Crafton identified Mims as "Bern," and identified him in a photo array.  *Id.*

In December 2003, McKee testified before a grand jury.  *Id.* at ¶ 49.  Specifically, she testified that she knew Mims and saw him fire a rifle-style weapon at the Rosenwald before fleeing the scene.  *Id.*

Przepiora re-interviewed Crafton in December 2003 and October 2004.  *Id.* at ¶¶ 52–53.  Both times, Crafton largely repeated what she told the police back in 2001.  *Id.*

In 2003 and 2004, the police re-interviewed other witnesses, too.  In early 2004, officers spoke with Wallace Fields again.  *Id.* at ¶ 60.  They showed Fields a photo array, and Fields identified Mims as the shooter.  *Id.*  Fields signed the back of the photo, underneath McKee's signature from the 2001 photo identification.  *Id.*  Soon after Fields was re-interviewed, he testified before a grand jury that Mims shot Baker.  *Id.* at ¶ 61.

The police also re-interviewed Bolo Jones (the Gangster Disciple who was apparently the intended target of the shooting) in 2004.  *Id.* at ¶ 64.  Jones repeated much of what he told the police in 2000, right after the shooting.  *Id.*

But Jones gave the police new information, too.  For the first time, he told the police that he spoke to McKee two days after the shooting – and that McKee told him that she saw "Bern" shoot Baker.  *Id.*

Like McKee and Fields, Jones testified before a grand jury. *Id.* at ¶ 65. Jones testified that McKee told him that "Bern" from the Black Disciples killed Baker. *Id.* Jones also testified about why he believed that he was the shooter's intended target. *Id.*

Finally, Przepiora re-interviewed Williams (the witness who helped the police with a composite sketch of the shooter and gun) in June 2004. *Id.* at ¶ 66. Williams recounted his observations of the shooting, but he could not identify the shooter when the police presented him with a photo array. *Id.*

Williams then testified before a grand jury. *Id.* Williams testified that he saw an SUV enter the gas station. *Id.* Williams said he saw a man exit the SUV's rear passenger door holding an "AK." *Id.* Williams testified that the man had a dark complexion and five o'clock shadow-type mustache, beard, and goatee, and was wearing a black hat with a dark blue jean jumpsuit. *Id.*

## III. The Criminal Trial

Based on that body of evidence, Przepiora obtained an arrest warrant for Mims and took him into custody on July 7, 2004. *Id.* at ¶¶ 67–68. Three weeks later, the Cook County State's Attorney's Office sought an indictment from the grand jury. *Id.* at ¶ 71.

The grand jury returned indictments on one count of first-degree murder for Baker, and three counts of attempted murder for Davis (who was shot in the leg), and Edward Ross and Darrell Garrett (who were standing with Baker at the time of the shooting). *Id.*

Judge Toomin presided over the pretrial proceedings. *Id.* at ¶ 74. In 2005, Judge Toomin ordered that Mims should have access to all impounded records (including the 2001 recordings). *Id.* Mims's defense attorney (Daniel Franks) received at least two tapes. But after review, he believed that they had little evidentiary value. *Id.* at ¶ 75.

Franks moved to suppress the pretrial identifications by McKee and Fields, arguing that they were "unduly and improperly suggestive." *Id.* at ¶ 76. At a 2005 hearing, Judge Toomin found no evidence showing that the statements were tainted, and admitted the evidence. *Id.*

But Judge Toomin allowed Franks to reopen the motion to suppress in February 2006, just before Mims's trial was set to begin, for the purpose of questioning Officer Przepiora about McKee's identification. *Id.* at ¶ 77. Judge Toomin concluded that the procedures used did not taint the identification. *Id.* at ¶ 79.

Mims's bench trial before Judge Toomin began in February 2006. *Id.* at ¶ 74. At trial, Fields and McKee identified Mims and testified that they saw him shoot Baker. *Id.* at ¶¶ 82–83. Detective Przepiora testified, too. He testified that he interviewed Fields, and that Fields identified Mims. *Id.* at ¶ 86.

Gang Crimes Specialist Richard Lombard testified at trial about Mims's ties to the Black Disciples based on his tattoos, including the one reading "Burn." *Id.* at ¶ 84. The prosecution also presented testimony from Sheriff Robert Walker (a friend of Baker's), Officer Arthur Oswald (about forensics and ballistics recovered from the crime scene), Bolo Jones, Darrell Garrett, Dr. Mitra Kalelkar (a pathologist), and Kurt Zielinski (about ballistics evidence). *Id.* at ¶ 80.

Mims, for his part, called Donna Eason, his then-girlfriend and mother to five of his six children. *Id.* at ¶¶ 81, 87. Eason testified that Mims was home the night of the shooting, recovering from various injuries. *Id.* at ¶ 87. Mims also entered into evidence Fields's first interview with the police. *Id.* at ¶ 81. Mims did not testify. *Id.* at ¶ 87.

In rebuttal, the State called Cook County Hospital nurses who testified that Mims went to the hospital at least nine days before the Baker homicide for his earlier injuries, but that he had

11

complained of no pain except upon palpation of his wound. *Id.* at ¶ 88. He was released from the hospital the same day he was admitted, without prescription medication. *Id.*

On May 16, 2006, Judge Toomin convicted Mims of the first-degree murder of Baker and the attempted murders of Garrett and Ross. *Id.* at ¶ 89. Judge Toomin sentenced Mims to 95 years in prison. *Id.*

## IV.     Postconviction Proceedings

A decade later, in 2015 and 2016, the Cook County State's Attorney's Office Conviction Integrity Unit began investigating Mims's conviction. *Id.* at ¶ 94. And on October 27, 2016, that office filed a petition requesting Mims's conviction and sentence be vacated, and moved to drop the charges *nolle prosequi*. *Id.*

The office gave reasons for the dismissal, too. *Id.* at ¶ 96. It explained that Mims's medical condition at the time of the crime "was certainly a factor" that contributed to the decision. *Id.* Another contributing factor was the "troubling . . . dual representation of Mr. Mims and an alternate suspect in the crime by the same attorney, Dan Franks." *Id.*

A court ordered Mims's immediate release after the state moved to drop the charges. *Id.* at ¶ 94. And a week later, Mims filed for a Certificate of Innocence ("COI"), which was granted without opposition from the Cook County State's Attorney's Office. *Id.* at ¶ 97.

## V.     The Lawsuit

In October 2018, Mims filed suit against the City of Chicago and Chicago police officers Kenneth Boudreau, Richard Peck, Robert Montgomery, Daniel McNally, Ted Przepiora, Michael McDermott, Raymond Kaminski, Jean Romic, and John Clisham. *See* Cplt. (Dckt. No. 1). The complaint contained nine counts.

Counts I–VI allege various constitutional violations by each of the Officer Defendants. *See id.* at ¶¶ 176–211. Count I alleges destruction and/or concealment of material evidence. *Id.* at ¶¶ 176–79. Count II is about fabrication of evidence. *Id.* at ¶¶ 180–88. Count III is a claim about failure to intervene. *Id.* at ¶¶ 189–94. Count IV is a conspiracy claim. *Id.* at ¶¶ 195–201. Count V alleges unlawful pretrial detention. *Id.* at ¶¶ 202–06. Count VI is for deprivation of liberty without probable cause. *Id.* at ¶¶ 207–11.

Count VII is a state-law claim for malicious prosecution by the Officer Defendants. *Id.* at ¶¶ 212–19. Counts VIII and IX are against the City of Chicago for indemnification and *respondeat superior*, respectively. *Id.* at ¶¶ 220–25.

Fact discovery lasted more than two years. After turning over all of the stones in the quarry, Defendants filed a motion for summary judgment on all of Mims's claims. *See* Mtn. for Summ. J., at 2 (Dckt. No. 173). Defendants argued that each of the claims fails on the merits. *Id.* The Officer Defendants also contend that they are entitled to qualified immunity on the constitutional claims. *Id.* at 1–2.

In his response brief, Mims agreed to dismiss several of the claims. *See* Pl.'s Resp. (Dckt. No. 184). Mims does not oppose summary judgment on five counts: Count III (failure to intervene), Count IV (conspiracy), Count V (illegal pretrial detention), Count VI (deprivation of liberty without probable cause), and Count VII (malicious prosecution). *Id.* at 13. Mims also does not oppose dismissal of Defendants Boudreau, Peck, Montgomery, and Kaminski. *Id.* Those claims and those Defendants are hereby dismissed, with prejudice.

Only four claims are left. The remaining claims include a claim about the destruction or concealment of evidence (Count I), and about the fabrication of evidence (Count II). The two

other claims involve the City of Chicago paying the tab under a theory of indemnification (Count VIII) or *respondeat superior* (Count IX).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256. "[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Carmody v. Bd. of Tr. of Univ. of Illinois*, 893 F.3d 397, 401 (7th Cir. 2018).

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Four claims remain in the case. Two of the claims are substantive claims, and the other two claims are about the City's obligation to pick up the tab.

The two substantive claims arise under the Due Process Clause of the Fourteenth Amendment. Count I alleges the concealment of evidence, and Count II alleges the fabrication of evidence through an unduly suggestive photo array. Counts VIII and IX are against the City for indemnification and *respondeat superior*, respectively.

The Court will address the two due process claims on the merits, before turning to qualified immunity. And then, the Court will turn to whether the City has a duty to pay, if any claim is left standing.

## I. Concealment of Evidence (Count I)

The first claim alleges the concealment or destruction of evidence in violation of the Due Process Clause of the Fourteenth Amendment. *See* Cplt., at ¶¶ 176–79 (Dckt. No. 1). In response to the motion for summary judgment, Mims focuses only on the concealment of evidence, not the destruction of evidence. *See* Pl.'s Resp., at 11–12 (Dckt. No. 184). The Court will do the same.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The duty of production extends to the executive branch, including the police. *See Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008). The police must disclose exculpatory evidence to the prosecutors so that they, in turn, can disclose the evidence to the defendant. *See Coleman v. City of Peoria*, 925 F.3d 336, 349 (7th Cir. 2019).

15

"To prevail on a civil *Brady*-based due process claim against a police officer, a plaintiff must demonstrate that the evidence in question was favorable to him, the police 'suppressed' the favorable evidence, and prejudice ensued because the suppressed evidence was material." *Anderson v. City of Rockford*, 932 F.3d 494, 505 (7th Cir. 2019). Favorable evidence is either exculpatory or impeaching. *See Harris v. Kuba*, 486 F.3d 1010, 1016 (7th Cir. 2007).

"Evidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Carvajal*, 542 F.3d at 567.

Suppressed evidence is material if there is a reasonable probability that the verdict by the finder of fact would have been different if the evidence had been presented to it. *See Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019) ("*Goudy II*"). If, in light of the entire record, "the cumulative effect of all the suppressed information is to undermine confidence in the verdict," the evidence is material. *Id.* (quoting *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010)).

Mims brings his *Brady* claim against police officers (Przepiora and McNally), rather than against the prosecutors. So Mims must show that the *officers* suppressed the evidence. *See, e.g.*, *Cairel v. Alderden*, 821 F.3d 823, 832 (7th Cir. 2016) (affirming summary judgment in favor of detectives on a civil *Brady* claim when "undisputed facts show[ed] that exculpatory evidence was not concealed by the detectives as required to establish a civil *Brady* claim against them"); *Mosley v. City of Chicago*, 614 F.3d 391, 397–98 (7th Cir. 2010) (concluding that a civil *Brady* claim failed because the record lacked support for the notion that the officers withheld any favorable evidence).

Mims contends that his defense attorney (Franks) received only two recordings. And most importantly, defense counsel did not receive the recording where Sardin allegedly

"admitted confessing" that he had shot Baker. *See* Pl.'s Resp., at 11–12 (Dckt. No. 184). Mims asserts that a reasonable jury could determine that Officers Przepiora and McNally knew about exculpatory evidence, and failed to disclose it to the prosecutor. *Id.* at 12.

Mims attempts to build an inference of suppression by pointing to the number of recordings. *See* Pl.'s Resp., at 11–12 (Dckt. No. 184). There were five recordings in the so-called "consensual overheard." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 24 (Dckt. No. 192). But according to Mims, the prosecutor produced only two of the five recordings to defense counsel.

Mims skips over a link in the chain. It is not enough to show that defense counsel did not receive the recordings from the prosecutor. Mims needs to come forward with evidence that the police withheld those recordings from the prosecutor.

After all, the claim is against the police, not the prosecutor. The first link in the chain is from the police to the prosecutor, and the second link in the chain is from the prosecutor to defense counsel.

Evidence about the first link in the chain seems to be missing. Mims's brief makes the following statement about the recordings possessed by the prosecutor (Delaney): "The evidence shows that there were five recordings as part of COH-13. *Id.* ¶ 24. *ASA Delaney only had two of them. Id.* ¶ 75. Delaney gave those to Mims's defense attorney, Dan Franks. *Id.*" *See* Pl.'s Resp., at 11 (Dckt. No. 184) (citing Pl.'s Resp. to Defs.' Statement of Facts (Dckt. No. 192)) (emphasis added).[4]

The evidentiary basis for that statement seems to be missing from the record. Notice the citation – Mims relies on his response to paragraph 75 of Defendants' statement of material facts.

---

[4] The discussion of the *Brady* claim in Plaintiff's brief is rather cursory, spanning less than a page. *See* Pl.'s Resp., at 11–12 (Dckt. No. 184).

In that response, Mims wrote: "Admit, but state that Delaney's documents show he tendered only two audiotapes to Franks. Ex. 33 (Delaney Dep.) at 163. The two tapes that Delany [sic] tendered to Franks did not have exculpatory information on them. *Id.* at 164-65." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 75 (Dckt. No. 192).

This Court looked for those pages of testimony, but they appear to be missing from the record. The transcript of the Delaney deposition is in the record, but not the whole thing. The Delaney deposition transcript is in the record as Exhibit No. 33 as part of Defendants' statement of material facts. *See* Delaney Dep. Tr. (Dckt. No. 180-2, at 124–166 of 166).

But pages 163 to 165 were missing. The parties submitted only some of the pages, and the collection jumps from page 160 of the deposition transcript (Dckt. No. 180-2, at 161 of 166) to page 199 of the deposition transcript (Dckt. No. 180-2, at 162 of 166).

So, the record before the Court does not support the notion that the prosecutor produced only two of the five recordings to defense counsel. At best, the evidence in the record supports the notion that defense counsel listened to the recordings that he received, and did not believe that they contained exculpatory material.

And in any event, the passage in question addressed what recordings the prosecutor produced to defense counsel (*i.e.*, the second link in the chain). It did not address what recordings the police produced to the prosecutor (*i.e.*, the first link in the chain).

At best, Mims has come forward with evidence that defense counsel did not receive all of the recordings from the prosecutor. That's a foot in the door, but it is not enough to walk through the door of the courthouse and get to a jury.

To bring a claim against the police, Mims would need to come forward with evidence that the police withheld *Brady* material from the prosecutor. *See Coleman*, 925 F.3d at 349.

And here, the record lacks evidence that the police withheld any recordings. The cited testimony does not support the notion that the police had the recordings, but the prosecutor *didn't*.

Maybe there is evidence somewhere else in the record to support the notion that the police did not produce all of the recordings to the prosecutor. But if so, it is not this Court's job to hunt for it. Summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005). "A party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.'" *Caisse Nationale de Credit v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (citation omitted); *Albrechtsen v. Bd. of Regents of Univ. of Wisconsin Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

The claim fails for a second, independent reason. On this record, no reasonable jury could find that the recordings in question were material. Even if defense counsel did not receive the recordings in question, no reasonable jury could conclude that they would have made a difference.

"Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Carvajal*, 542 F.3d at 567 (cleaned up). "The Supreme Court has made clear that *Brady*'s 'reasonable

probability' standard is less onerous than the traditional preponderance standard." *Anderson*, 932 F.3d at 505.

"[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). That is, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* Courts must look at the cumulative effect of the suppressed evidence in light of the entire record. *Id.*

Mims describes the Sardin recording as a "confession," but it's not much of a confession. If the recording is a bombshell, it's a dud.

The conversation is not the easiest to follow, but it largely consists of Sardin denying involvement in the Baker murder. For example:

| | |
|---|---|
| SPEAKER 1: | [Richardson]: Man, you wasn't there, dude? |
| SPEAKER 2: | [Sardin]: Hell, no. |
| SPEAKER 1: | I'm talking about the truck, man. They – they – they – they burnt that truck up? |
| SPEAKER 2: | Man, I don't know. They ain't got that damn truck. |
| SPEAKER 1: | They ain't got it? |
| SPEAKER 2: | Hell, no. F*** me, man. |
| SPEAKER 1: | You ain't worried about that s***? |
| SPEAKER 2: | Hell, no. All I know I ain't did s***. I ain't worried about s***. I don't know nobody that did s*** for. I ain't do this s*** and I'm going to be right. |
| SPEAKER 1: | Why you telling me that s***, B? |

20

| | |
|---|---|
| SPEAKER 2: | What? |
| SPEAKER 1: | That you did that s***. |
| SPEAKER 2: | Hell, no, man. |

*See* 21_FEB_01_1750_TAPE2 Tr., at 4:6-22 (Dckt. No. 187-17).  That's not much of a confession.

Interpreted in the light most favorable to Mims, another snippet of the recording contains thin evidence suggesting that Sardin had knowledge about the Baker murder.  In another portion of the recording, Sardin mentions that "Bean got rid of" an AK-47 "same day that s*** happened." *See id.* at 8:11-19.  Sardin also states that "They gave that s*** back to dude." *Id.* at 8:22-23.  (This Court does not know who "Bean" and "Dude" are.)

At most, the recording might have given Franks (Mims's attorney) reason to investigate Sardin's knowledge of the crime.  But Franks had access to the affidavits, applications, and judicial orders related to the recordings. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 74 (Dckt. No. 192).  Those records were sufficient to signal to Franks that Sardin might have valuable information about the shooting. *See Cairel*, 821 F.3d at 832 (opining that *Brady* claim failed where plaintiffs could have developed the evidence that they argued was suppressed).

The recording itself was hardly a smoking gun.  There is no "reasonable probability" that the verdict would have been different had Franks had access to the record. *See Strickler v. Greene*, 527 U.S. 263, 280 (1999).  Simply put, the recording was not material, and any nondisclosure would not have prejudiced Mims.

In fact, the record confirms that the recordings weren't material, for a basic reason.  Judge Toomin received all five recordings.  Judge Toomin listened to all five recordings.  And the recordings did not make a difference.

21

Mims claims that Franks (his defense attorney) only received a partial set of recordings from the prosecution. But he does not contest that the recordings were possessed by the *court*. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 25 (Dckt. No. 192). Everyone agrees that Judge Toomin had them and heard them.

"On March 9, 2001, Judge Toomin entered a Retention and Review order, stating he listened to the tapes recorded under COH 013 and that copies were to be kept by the CCSAO, whereas the original tapes, as well as the original application and order allowing use of an eavesdropping device, were to be impounded with the Clerk of Court." *Id.*

Judge Toomin issued an order when he impounded the recordings, saying: "*I, Michael Toomin*, Judge of the Circuit Court of Cook County, Illinois, *have listened to the tapes* recorded under the above numbered judicial application and order . . . ." *See* Ex. 30, 3/9/01 Retention and Review Order (Dckt. No. 180-2, at 108 of 166) (emphasis added).

Mims opted for a bench trial, before Judge Toomin. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 74 (Dckt. No. 192). So, the trier of fact listened to the tapes. And after listening to the recordings, Judge Toomin found Mims guilty. The tapes did not change the outcome.

Regardless of whether Mims's attorney received all of the tapes, Judge Toomin heard them for himself. Judge Toomin listened to the recording, and still returned a guilty verdict.

In sum, Mims's *Brady* claim falls apart on multiple levels. There is no evidence in the record showing that the Officer Defendants suppressed evidence. And on this record, a reasonable jury could not find that the recordings were material. The Court therefore grants summary judgment on the claim about the concealment or destruction of evidence (Count I).

## II.      Fabrication of Evidence (Count II)

Count II is another due process claim.  *See* Cplt., at ¶¶ 180–88 (Dckt. No. 1).  Mims

alleges that the officers fabricated evidence through an unduly suggestive photo array.

Officers violate a defendant's right to due process when they "knowingly use false

evidence . . . to obtain a tainted conviction."  *Napue v. People of State of Illinois*, 360 U.S. 264,

269 (1959).  To prove fabrication, Mims must show that Defendants knew, "with certainty," that

the evidence was false.  *See Coleman*, 925 F.3d at 344.

That's a high bar.  It does not satisfy the knowledge requirement to show that the officers

had reason to doubt the evidence.  *Id.* at 345.  "Fabricating evidence that the officer knows to be

false is different than getting a reluctant witness to say what may be true."  *Id.* at 346 (cleaned

up).  A fabrication of evidence claim is about the existence of certainty, not questions.  It's about

exclamation points, not question marks.

Mims's claim is about the identifications of Mims by McKee and Fields.  Basically,

Mims argues that Officer Przepiora "created false evidence by designing an identification

procedure – either a showup or improper 'array' – that he knew would result in McKee selecting

Mims. . . . The same applies to Fields, since Photo Array I was shown to Fields."  *See* Pl.'s

Resp., at 8 (Dckt. No. 184).

Once again, the bar is high.  "[T]he Fourteenth Amendment's Due Process Clause

requires the exclusion of an eyewitness identification if the unduly suggestive circumstances are

so egregious as to taint the entire trial."  *Coleman*, 925 F.3d at 347.  Courts use a two-step

analysis when evaluating claims about an unduly suggestive identification.  *See United States v.*

*Rogers*, 387 F.3d 925, 936 (7th Cir. 2004).

"First, the defendant must establish that the identification procedure was unduly suggestive." *United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007). Second, if the procedure was unduly suggestive, the court must consider "the totality of the circumstances to determine whether the identification remains sufficiently reliable to still be admitted." *Manson v. Brathwaite*, 432 U.S. 98, 113–14 (1977).

Five factors come into play when evaluating reliability: (1) the witness's opportunity to observe the offender; (2) the witness's degree of attention; (3) the accuracy of the witness's previous description of the offender; (4) the witness's degree of certainty; and (5) the amount of time between the crime and the confrontation. *See Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).

Mims's photograph is first from the left (he appears to have braids and light facial hair, and is wearing a black jacket) in the array below. *See* Ex. 44 (Dckt. No. 180-5).



The Court will begin by addressing Mims's argument about the suggestive nature of the identification procedures. Next, the Court will address whether the identifications were nonetheless reliable. And then, the Court will assess whether there is sufficient evidence to show that the officers created evidence that they knew to be false.

24

### A.      Unduly Suggestive

The first question is whether a reasonable jury could conclude that the photo array was unduly suggestive.  Again, the Court views the evidence in a light favorable to Mims as the non-movant.  Even with the scales in his favor, Mims does not put enough on the table to get to a jury.

Mims makes four main arguments about the suggestive nature of the photo array:  (1) he was shown wearing a black jacket, which is what the shooter was described by some witnesses as wearing; (2) the other suspects do not resemble him; (3) multiple potential suspects were in the array; and (4) there were too many people in the array.  *See* Pl.'s Resp., at 7–9 (Dckt. No. 184).  The Court will address the arguments in that order.

First, Mims argues that the photo array was unduly suggestive because he was the only person wearing a black jacket.

In the array, Mims is pictured wearing a black jacket.  And both McKee and Fields described the shooter as wearing black.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 17, 40 (Dckt. No. 192).  So, the photo array showed Mims wearing a black jacket – just like the alleged shooter.

The police had other photos to choose from, too.  In other mugshots, Mims was not wearing black.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 43 (Dckt. No. 192).  The police could have selected a different picture of Mims wearing a different outfit.

"Lineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification."  *Israel v. Odom,* 521 F.2d 1370, 1374 (7th Cir. 1975).

25

But a black jacket is not all that suggestive. Unlike, say, a red bucket hat or a yellow jersey, a black jacket is not a particularly distinctive item of clothing. It's a common article of clothing. If anything, a black jacket is the type of thing that you wear if you want to blend in, not stick out. If you think that a black jacket is distinctive, take a look down the street (or look in your closet).

So, standing alone, the fact that Mims was in black (and the shooter was also in black) is not especially suggestive. *See, e.g.*, *United States v. Williams*, 522 F.3d 809, 810–12 (7th Cir. 2008) (holding that a lineup was not unduly suggestive despite the fact that the defendant was the only one in the lineup wearing white tennis shoes – the same shoes that the suspect was reported as wearing); *United States v. Peterson*, 411 F. App'x 857, 864 (6th Cir. 2011) (rejecting defendant's claim that a photo array was unduly suggestive when he was the only one in dark clothing, similar to what the robber was described as wearing). He didn't stick out like a sore thumb, with the outfit screaming "Pick Me."

The photo array showed a wide range of colors of clothing. The range of colors ran the spectrum. Nothing stood out. Mims was not the only person wearing dark clothing, either. The person right below him in the lineup was wearing a black shirt. It is not as if Mims was wearing black, and everyone else was wearing white. The contrast was not stark.

And in any event, the color of clothing can carry only so much weight. It is not as if the police told the witnesses that they caught and photographed all of the people fleeing the scene, and the witnesses looked for a person wearing a black jacket, and saw only one option. People change clothes, and everyone knows that people change clothes. Unless clothing is truly distinctive – think Elton John – the clothing worn by participants in a photo array can get you only so far.

Second, Mims argues that no one else pictured in the array resembles him. That's tricky business, because whether someone looks like someone else is in eye of the beholder.

"A lineup of clones is not required." *United States v. Arrington*, 159 F.3d 1069, 1073 (7th Cir. 1998). "[D]ifferent skin coloration . . . is inevitable in any array or sequence of photos – just as it is inevitable that the facial hair, ear sizes, and chin shapes will not be identical." *United States v. Johnson*, 745 F.3d 227, 230 (7th Cir. 2014).

Witnesses described the shooter as a black male with a light or medium complexion. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 9 (Dckt. No. 192). The photographs show eleven men matching this description. While none of the other men could be mistaken for Mims's twin, their images aren't so dissimilar that the array is unduly suggestive, either. Nothing about his appearance in the photo array made Mims stand out from the crowd.

Third, Mims argues that the photo array was unduly suggestive because it contained multiple suspects. That is, Mims argues that the police filled the photo array with people that the police suspected were involved in the shooting. Imagine filling a lineup with The Joker, The Penguin, The Green Goblin, and Lex Luthor. It's like having a deck of cards, and stacking the deck with suspects. It increases the chances of picking *someone* who is a suspect.

Mims's expert opined that including multiple suspects makes a lineup like a multiple-choice test without wrong answers. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 17 (Dckt. No. 197).

The use of multiple suspects in the same photo array might have defied best police practices. But it did not increase the odds of picking *Mims*. Using photos of other suspects might increase the odds of the police getting an answer they like. But it does not increase the odds of choosing any *particular* suspect. *See Phillips v. Allen*, 743 F. Supp. 2d 931, 944 (N.D.

27

Ill. 2010) (Dow, J.), *aff'd*, 668 F.3d 912 (7th Cir. 2012) (reasoning that photographic lineup was not unduly suggestive in part because witness "viewed either 30 or 36 photos. Lineups of far fewer individuals have been found sufficient.").

Fourth, Mims argues that the array included *too many* photos. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 13 (Dckt. No. 197). But increasing the number of photos *helped* Mims. Increasing the number of photos gave the witnesses more options to choose from, and thus more opportunities to pick someone else.

Including lots of photos increased the denominator, and reduced the chances of picking any particular person. The higher the number of photos, the lower the chance that any one photo would be selected. Mims was *better* off because the array had more photos, not worse off. *See Phillips*, 743 F. Supp. 2d at 944. If you were in the lineup, and you could choose between 5 other people or 15 other people being in the lineup with you, it wouldn't be a close call.

To be sure, Mims contends that the officers initially showed McKee a single photo. That's known as a "showup." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 192).

The Seventh Circuit has cautioned that showups are particularly suggestive. *See United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007); *United States v. Newman*, 144 F.3d 531, 535 (7th Cir. 1998). Still, "showups are proper and not unduly suggestive under certain circumstances." *Armstrong v. Young*, 34 F.3d 421, 427 (7th Cir. 1994) (citations omitted).

A showup is less suggestive when the witness is already acquainted with the suspect. *See United States ex rel. Sanders v. Detella*, 814 F. Supp. 690, 696 (N.D. Ill. 1993). It doesn't plant a seed when the seed is already familiar.

Here, the police did not show McKee a picture of a complete stranger. They did not create an indelible mental image of someone that McKee had never seen before. Instead, the police showed her a picture of Mims – someone who she already knew. McKee already had familiarity with Mims, which reduced the risk of suggestiveness. The fact that the officers showed McKee a single picture, in and of itself, is not enough to create a genuine issue of material fact.

### B. Reliability of the Identifications

The photo array cannot give rise to a claim for another reason. The photo array was sufficiently reliable. *See Manson*, 432 U.S. at 113–14.

Both McKee and Fields recognized the shooter and had seen him before (but Fields didn't know his name). *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 17, 38 (Dckt. No. 192). They had ample opportunity to observe the shooter before the identification. *See Biggers*, 409 U.S. at 199–200. And McKee and Fields have never testified that officers influenced their identifications. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 94 (Dckt. No. 192).

McKee told the police that she had known the shooter for two years, as someone by the name of "Bern." *Id.* at ¶ 38. Mims disputes that he was known by the nickname "Bern." But his first name is "Bernard." He had a tattoo reading "Burn." His arrest record said his nickname was "Berny." *Id.* at ¶ 42. Crafton identified Mims as "Bern," too. *Id.* at ¶ 52.

No evidence suggests that McKee or Fields were tricked into choosing Mims's photo. In fact, the evidence suggests that it would have been difficult for the police to trick them into picking Mims. After all, they knew Mims, and had seen him before.

Indeed, even if the procedures were unduly suggestive, the identifications were *reliable* because McKee and Fields already knew the shooter. McKee and Fields weren't identifying

someone they only got a quick glimpse of mid-shooting. They were identifying someone who they had seen on multiple occasions.

McKee and Fields stood by their IDs, too. Twice, they identified Mims as the shooter when they stood on the witness stand (before the grand jury and at trial). *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 49, 61, 82–83 (Dckt. No. 192). So, even if the photo array was impermissibly suggestive, the totality of circumstances made it sufficiently reliable for admission. *See Brathwaite*, 432 U.S. at 113–14.

Importantly, the question about the suggestive nature of the identifications by Fields and McKee is not new. Judge Toomin ruled on whether to suppress the identifications by McKee and Fields on the grounds that identification procedures and photo arrays were unduly suggestive. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 76–79 (Dckt. No. 192). After hearing the objections, Judge Toomin believed that the identifications were sufficiently reliable.

Mims (correctly) points out that Judge Toomin's ruling on the motion to suppress has no preclusive effect given that his conviction was vacated. *See* Pl.'s Resp., at 11 (Dckt. No. 184); *see also* Defs.' Reply, at 10 (Dckt. No. 200) ("Mims is correct that the ruling by Judge Toomin does not collaterally estop Mims's claim[.]").

While not legally binding on this Court, Judge Toomin's boots-on-the-ground ruling has probative value. Judge Toomin considered whether to suppress the identifications on multiple occasions. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 76–79 (Dckt. No. 192). He held a hearing in November 2005. *Id.* And he allowed Franks (again, defense counsel) to reopen the motion in February 2006, right before Mims's trial began, so that another witness (Officer Przepiora) could testify. *Id.*

Franks identified the same flaws with the photo array then that Mims raises now.

In February 2006, Franks argued that McKee was initially shown a single photograph of Mims, and later shown the array with eleven photos. *See* 2/16/06 Tr., at 43:6 – 46:16 (Dckt. No. 180-8). Franks also argued that the eleven images were unduly suggestive because each one showed a Black Disciple, and that only four or five photos should have been used. *Id.* at 49:15 – 50:4. Franks argued that the other individuals pictured didn't resemble Mims, too. *Id.* at 50:16-20.

Judge Toomin heard those arguments and rejected all of them. *Id.* at 52:12 – 53:10. Basically, Judge Toomin thought about whether the photo identifications by McKee and Fields were unduly suggestive and should be suppressed. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 76–79 (Dckt. No. 192). Judge Toomin gave Mims multiple opportunities to call witnesses and make arguments about inadmissibility of the identifications by McKee and Fields, and concluded they were sufficiently reliable. Judge Toomin had the chance to assess the reliability of McKee and Fields when they took the witness stand, too. *Id.* at ¶¶ 82–83.

This Court is not compelled to land in the same place as Judge Toomin. But after reviewing the evidence, this Court agrees. The photo array was not unduly suggestive, and even if it was unduly suggestive, it was sufficiently reliable for admission.

### C. Knowledge of Falsity

Another hurdle remains, and it is tall. For a fabrication of evidence claim, Mims must show that Defendants knew, "with certainty," that the evidence was false. *See Coleman*, 925 F.3d at 344. It is not enough to give reasons why Defendants had reason to doubt the evidence. *Id.* at 345. The epistemological bar is high – a claim requires certainty, not a reason to doubt.

At best, Mims offered evidence suggesting that Officer Przepiora may not have used the accepted procedures for putting together a photo array. *See* Defs.' Resp. to Pl.'s Statement of

31

Facts, at ¶ 13 (Dckt. No. 197). For instance, Przepiora may have used more photos in the array than he had been trained to use. That evidence falls far short of suggesting that Przepiora *knowingly* got McKee and Fields to falsely identify Mims.

Indeed, McKee and Fields have never alleged that any police officer influenced them to pick Mims. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 94 (Dckt. No. 192). And if Przepiora used *more* photos than he should have, Mims was *less* likely to get picked.

Simply put, there is no evidence – direct or circumstantial – that would allow a reasonable jury to find that Officer Przepiora planned to have McKee or Fields falsely identify Mims, and knew that the evidence was false. Mims cannot show, as a matter of law, that Przepiora (or any other officer) knowingly fabricated evidence.

The section of Mims's brief opposing summary judgment on Count II focuses almost entirely on the identifications by McKee and Fields. But in one paragraph, Mims argues that "there is strong evidence that [Officers Przepiora and McDermott] (working as a 'team') purposefully hid evidence that would have revealed that there was a conspiracy between Demetrius Milon, Lithia Henderson, Tashundra Crafton, Thomasina McKee and Wallace Fields to frame Mims for Baker's murder." *See* Pl.'s Resp., at 7 (Dckt. No. 184). Mims alleges that Officers Przepiora and McDermott "knowingly destroyed notes . . . or failed to document interviews, hid how McKee came to their attention, hid evidence that they interviewed Henderson and Milon, and used manipulative and deceptive police procedures to obtain a conviction that they knew to be false." *Id.*

As a threshold matter, many of these arguments seem more like destruction of evidence arguments. Yet, Mims is not pursuing a claim against Officers Przepiora or McDermott for destroying notes or information about interviews.

In support of his theory that Milon, Henderson, Crafton, McKee, and Fields conspired to frame him, Mims provides citations to his Rule 56 statement, and to his response to Defendants' Rule 56 statement. But the cited facts don't support a fabrication of evidence claim.

For instance, paragraph 3 of Mims's own statement (presumably cited to support the notion that the officers hid evidence about interviewing Milon) does not show that officers ever interviewed Milon at all. *See* Def.'s Resp. to Pl.'s Statement of Facts, at ¶ 3 (Dckt. No. 197).

In another example, Mims points out that Officer McNally could not recall whether he took notes at his interview with Richardson (where Richardson told McNally that Sardin, Chester, and McNeil murdered Baker). *Id.* at ¶ 21. However, McNally prepared a sworn affidavit about the consensual overheard. *Id.* McNally testified that everything that Richardson told him was included in that affidavit. *Id.* And that affidavit was used to obtain a court order to record conversations between McNally and Sardin. *Id.* So, the evidence does not suggest that McNally ignored evidence about the involvement of Sardin, Chester, or McNeil to frame Baker.

"Summary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.,* 612 F.3d 932, 937 (7th Cir. 2010). "[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Carmody v. Bd. of Tr. of Univ. of Illinois*, 893 F.3d 397, 401 (7th Cir. 2018).

At bottom, Mims's argument that there was a conspiracy between Milon, Henderson, Crafton, McKee, and Fields to frame him for the Baker murder is pure conjecture. The allegations are too speculative to survive summary judgment.

In sum, this Court concludes that no reasonable jury could find in favor of Mims on Count II. There is no evidence in the record to support a conclusion that the police knowingly fabricated evidence through the identification tactics they used. Count II is dismissed.

### III.    Qualified Immunity

Defendants argue that they are "entitled to qualified immunity on all of Plaintiff's Constitutional claims because their conduct did not violate clearly established law." *See* Mtn. for Summ. J., at 3 (Dckt. No. 173).

The Court is dismissing all of Mims's claims on the merits. So strictly speaking, the Court does not need to reach the issue of qualified immunity. Nonetheless, in the interest of completeness, the Court will briefly address qualified immunity.

Qualified immunity is a "doctrine designed to protect public officials from the effects of guessing wrong in a world of legal uncertainty." *See Anderson v. Cornejo*, 355 F.3d 1021, 1022 (7th Cir. 2004). "Qualified immunity shields a government official from suit when the official is performing a discretionary function and his conduct does not violate clearly established rights of which a reasonable person would have known." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 572 (7th Cir. 2014).

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Instead, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). But "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (citations omitted).

Qualified immunity is a burden-flipping affirmative defense. "Qualified immunity is an affirmative defense, but once the defendant raises it, 'the burden shifts to the plaintiff to defeat it.'" *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021); *Abbott v. Sangamon County*,

34

705 F.3d 706, 723 (7th Cir. 2013) ("Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of defeating it.").

The Court will consider the issue of qualified immunity for the concealment of evidence claim, and then the fabrication of evidence claim.

### A.    Concealment of Evidence

According to Mims, the officers should not receive qualified immunity on the *Brady* claim because "[i]t has been clearly established for decades that police officers must disclose exculpatory evidence." *See* Pl.'s Resp., at 12 (Dckt. No. 184).

That's true: case law pre-dating 2000 establishes that officers must disclose exculpatory evidence to the prosecution. *See, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 280 (1999). But that's a stratospherically high level of generality, almost leaving the atmosphere. *See Kisela*, 138 S. Ct. 1148. It's just shy of the orbit of "due process."

Even so, Mims's theory is that the *prosecution* failed to turn over evidence to his attorney. *See* Pl.'s Resp., at 11 (Dckt. No. 184). And that evidence – the recordings – was impounded by the court. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 25 (Dckt. No. 192). Judge Toomin ordered that the recordings be turned over to defense counsel, too. *Id.* at ¶ 74.

The officers had an obligation to disclose exculpatory evidence to the prosecution. But the officers did not have an obligation to ensure that court-impounded materials – to which the prosecution had access – actually made it into the hands of defense counsel.

In short, no clearly established law required the officers to do any more with the recordings than what they did. They gave the recording to the prosecutors, and the prosecutors gave the recordings to the trial court. Therefore, the officers are entitled to qualified immunity on Mims's *Brady* claim.

### B.      Fabrication of Evidence

Mims contends that "it has been clearly established since long before 2000" that officers violate due process by using unduly suggestive identification practices or fabricating evidence. *See* Pl.'s Resp., at 13 (Dckt. No. 184).

Defendants disagree. They argue that "no legal authority exists now, much less in 2001, 2002, 2003, or 2004" to support Mims's fabrication of evidence claim. *See* Defs.' Reply, at 12 (Dckt. No. 200).

Use of impermissibly suggestive photographic evidence violates a defendant's Fourteenth Amendment due process right if it creates a "very substantial" likelihood of "irreparable" misrepresentation. *See, e.g.*, *Simmons v. United States*, 390 U.S. 377, 384 (1968) (holding that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification"); *Neil v. Biggers*, 409 U.S. 188, 198 (1972) (opining that a suggestive out-of-court identification that creates a "very substantial likelihood of irreparable misidentification" violates a defendant's due process right); *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (noting that photographic identifications can violate due process depending on the likelihood of irreparable misidentification).

Mims argues that the photo array was intentionally designed to suggest to witnesses that they should pick Mims's photo. *See* Pl.'s Resp., at 7 (Dckt. No. 184) (asserting that Defendant Officer Przepiora "design[ed] an identification procedure . . . that he knew would result in McKee selecting Mims.").

36

But Mims's contention is not borne out by the facts. Use of photographic evidence is common practice. The use of a suggestive photo array would violate clearly established law only if it created an irreparable likelihood of misidentification. *See Simmons*, 390 U.S. at 384.

Both witnesses who viewed the photo array (McKee and Fields) had seen Mims before. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 17, 38 (Dckt. No. 192). So, the risk of misidentification was limited. The risk was low even if Officer Przepiora broke from best policing practices when choosing the photos to include in the array, and even if McKee was shown only a single photograph.

Given the case law at the time of the interviews, a reasonable officer would not have known that they violated clearly established law when they showed the photos to McKee and Fields.

Again, qualified immunity is a burden-flipping defense. Once Defendants raised it, Mims had the burden to show why qualified immunity should not apply. *See Taylor*, 10 F.4th at 806. But Mims "point[s] to no controlling or persuasive authority that clearly established that it was impermissible for the police to use a photo array" like this one. *See Holloway v. City of Milwaukee*, 43 F.4th 760, 767 (7th Cir. 2022), *cert. denied sub nom. Holloway v. City of Milwaukee*, 143 S. Ct. 1083 (2023). So "defendants are entitled to qualified immunity as a matter of law." *Id.*

The Court therefore agrees that Defendants are entitled to qualified immunity on the fabrication of evidence claim (Count II).

## IV.    Indemnification (Count VIII)

Count VIII seeks indemnification from the City of Chicago for the actions by the Officer Defendants. *See* Cplt., at ¶¶ 220–22 (Dckt. No. 1).

37

But the Court is granting summary judgment to the Officer Defendants on every claim left in this case. So, there is nothing to indemnify.

The Court therefore grants summary judgment to the City of Chicago on Count VIII.

## V.    *Respondeat Superior* **(Count IX)**

Count IX seeks to hold the City of Chicago liable for the torts committed by the Officer Defendants under the doctrine of *respondeat superior*. *See* Cplt., at ¶¶ 223–25 (Dckt. No. 1).

Under Illinois common law, an employer "may be held vicariously liable for the tort of an employee if the tort is committed within the scope of the employment." *See Richards v. U.S. Steel*, 869 F.3d 557, 565 (7th Cir. 2017) (citation omitted); *see also Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 991 (Ill. 2007).

But here, the Court is granting summary judgment to the Officer Defendants on all remaining counts. The Court did not conclude that the Officer Defendants committed any torts against Mims – in the scope of their employment or otherwise. So, the City of Chicago cannot be held liable under the doctrine of *respondeat superior*.

Therefore, the Court grants summary judgment to the City of Chicago on Count IX.

### Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted.

Date:  March 12, 2024                          _____
                                               Steven C. Seeger
                                               United States District Judge